RELATED DDJ

**FILED**
CLERK, U.S. DISTRICT COURT

05/02/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

Some activity that doesLynn Macy "In Pro Per"
P.O. Box #103
Twin Peaks, Ca. 92391
Telephone: (909) 744 -8480
Email: macybuilders@yahoo.com
    PLAINTIFF IN PRO PER

THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA EASTERN DIVISION
COMPLAINT

N/S

| | |
|---|---|
| Lynn Macy, as an individual,<br><br>PLAINTIFF,<br><br>vs.<br><br>SAN BERNARDINO COUNTY LAND USE SERVICES DEPARTMENT, a public entity.<br><br>DEFENDANTS. | Case No.: 5:24-cv-00948-KK(DTB)<br><br>COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL FOR:<br>**(1)** Extortion<br>**(2)** Restricting the Use of Land<br>**(3)** Municipal and Supervisorial Liability (42 U.S.C. § 1983).<br>**(4)** Intentional Infliction of Emotional Distress. |

**DEMAND FOR JURY TRIAL**

PLAINTIFF LYNN MACY, through their undersigned counsel, hereby files this

Complaint against Defendants San Bernardino County Land Use Services

Department, inclusive (collectively "Defendants"), alleges as follows:

## **JURISDICTION AND VENUE**

1. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and

    1343(a)(3-4) because Plaintiff assert claims arising under the laws of the

    United States including 42 U.S.C. §§ 1983 & 1985, the Fourth & Fourteenth

    Amendments of the United States Constitution. This court has

    supplemental jurisdiction over state law claims pursuant to 28 USC § 1367

    because those claims are so related to PLAINTIFF'S federal claims that the

    claims form part of the same case and/or controversy pursuant to Article

    III of the United States Constitution.

2. Venue is properly founded in this judicial district pursuant to 28 USC §§ 1391(b) and (c) in that a substantial part of the events giving rise to the claims in this action occurred within this District and Defendants are subject to personal jurisdiction in this district.

## PARTIES

3. PLAINTIFF LYNN MACY, is a citizen of the State of California, and at all relevant times herein was a resident in San Bernardino County in the State of California.

4. Defendant San Bernardino County Land Use Services Department is and at all times relevant a public entity located in the County of San Bernardino and existing under the laws of the State of California.

## FACTS COMMON TO ALL CAUSES OF ACTION

5. Each and every allegation set forth in each and every averment and allegation of this pleading hereby is incorporated by this reference in each and every averment and allegation of this pleading.

6. There's an important legal principle that says "ignorance of the law is no excuse." You can't defend your actions by arguing you didn't know they were illegal, even if you honestly did not realize you were breaking the law.

## FIRST CAUSE OF ACTION

### Extortion

**(By Plaintiff Against San Bernardino County Land Use Services Department)**

7. Plaintiff hereby re-alleges and incorporates by this reference, as though set forth in full, the allegations in paragraph 1 through 6, inclusive.

8. Defendants San Bernardino County Land Use Services Department forced Plaintiff to pay (Extortion) for a new address for Macyland, which is a

vacant property with no structures/buildings/houses. Plaintiff wanted address to be 1 Macy Way, instead were forced to pay for new address 0 (22390), changes that Plaintiff did not want, for the clear purpose of Extortion; obtaining money by using force, threats of Fines, Fees & Penalties, or fear of economic harm. Macyland is located at **A, B, C: A**) 0 Mojave River Road Cedarpines Park CA 92322, **B**) 22390 Mojave River Road Cedarpines Park CA 92322, **C**) 22437 Mojave River Road Cedarpines Park Ca 92322, (All the same religious place; address changed over the years due to County) & more specifically described as Tract #2341 Cedarpines Highlands #5. APN# 034303101-0000.

9. **2402. Hobbs Act -- Generally:** The Hobbs Act prohibits actual or attempted robbery or extortion affecting interstate or foreign commerce "in any way or degree." Section 1951 also proscribes conspiracy to commit robbery or extortion without reference to the conspiracy statute at 18 U.S.C. § 371. The statutory prohibition of "physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section" is confined to violence for the purpose of committing robbery or extortion. United States v. Franks, 511 F.2d 25, 31 (6th Cir. 1975) (rejecting the view that the statute proscribes all physical violence obstructing, delaying, or affecting commerce as contrasted with violence designed to culminate in robbery or extortion). The **extortion** offense reaches both the obtaining of property "under color of official right" by public officials & the obtaining of property by private actors with the victim's "consent, induced by wrongful use of actual or threatened force, violence, or **fear**," including **fear of economic harm**. See this Manual at 2405 & Evans v. United States, 504 U.S. 255, 265, 112 S.Ct. 1181, 1188 (1992)

(only a private individual's extortion of property by the wrongful use of force, violence, or fear requires that the victim's consent be induced by these means; extortion of property under color of official right does not require that a public official take steps to induce the extortionate payment).

10. **2403. Hobbs Act -- Extortion By Force, Violence, Or Fear:** A defendant need not create the fear of injury or harm which he exploits to induce the victim to give up property. See United States v. Duhon, 565 F.2d 345, 349 & 351 (5th Cir. 1978) (offer by employer to pay union official for labor peace held to be "simply planning for **inevitable demand for money**" by the union official under the circumstances); United States v. Gigante, 39 F.3d 42, 49 (2d Cir. 1994), vacated on other grounds & superseded in part on denial of reh'g, 94 F.3d 53 (2d Cir. 1996) (causing some businesses to refuse operations with the victim sufficiently induced the victim's consent to give up property, consisting of a right to contract freely with other businesses, as long as there were other businesses beyond defendants' control with whom the victim could do business). Moreover, attempted extortion may include an attempt to instill fear in a federal agent conducting a covert investigation or a defendant "made of unusually stern stuff." See United States v. Gambino, 566 F.2d 414, 419 (2d Cir. 1977) (argument that FBI agent pretending to be extortion victim could not be placed in fear is not a defense to attempted extortion of the agent); see also United States v. Ward, 914 F.2d 1340, 1347 (9th Cir. 1990) (an attempt to instill fear included a **demand for money** from a victim who knew that the defendant was only pretending to be a federal undercover agent when he threatened the victim with prosecution unless **money was paid**).

## SECOND CAUSE OF ACTION

### Restricting the Use of Land

### (By Plaintiff Against San Bernardino County Land Use Services Department)

11. Plaintiff hereby re-alleges and incorporates by this reference, as though set forth in full, the allegations in paragraph 1 through 10, inclusive.

12. Defendants San Bernardino County Land Use Services Department is **restricting the use** of Plaintiff's religious, nonprofit private property MacyLand (violating Plaintiff's **Constitutional right**), or to remove all restrictions, regulations, zoning, customs, or policies restricting Plaintiff's use of religious, nonprofit private property MacyLand located at: **0** Mojave River Road, Cedarpines Park, CA 92322, **22390** Mojave River Road, Cedarpines Park, CA 92322, **22437** Mojave River Road, Cedarpines Park, Ca 92322. (All the same place, address changed over the years due to **County**)

13. The Takings Clause of the **Fifth Amendment**, provides that ***"…nor shall private property be taken for public use, without just compensation."*** A taking may occur when a government regulation **restricts the use of land**, even if the government does not invade or occupy the land. The Supreme Court has defined "public use" broadly, encompassing such purposes as economic development.

14. AGINS v. TIBURON, 447 U.S. 255 (1980): "*The application of a general zoning law to particular property **effects a taking** if the ordinance does not substantially advance legitimate state interests, or **denies an owner economically viable use of his land**.*"

15. **Filing a Claim for Just Compensation: The Property Ownership Fairness Act** includes a **simple process to file a claim for compensation**, designed to

allow government & property owners to **negotiate a settlement without having to go to court**. Within three years of the time the restriction on use is first applied to property, the owner must send a simple letter to the government requesting just compensation. No clumsy, time-consuming administrative review process is involved. Instead, the **government has 90 days to decide whether to restore the property rights by waiving the land-use restriction or to pay the owner for taking those rights away.** If the government chooses not to apply the restriction, that waiver can be passed down to later owners of the property. If the government either rejects the claim letter or takes no action within three months, the owner can ask a court to order compensation. & because the government must pay a successful property owner's legal bill, bureaucrats have an incentive to cooperate & resolve disputes before going to court.

The Act was designed to enable **private citizens to file a claim without having to hire an attorney.** Lowering the costs & burdens of establishing a claim increases the likelihood of settlement without lengthy & expensive lawsuits, & helps discourage governments from exploiting property owners who do not know the law. The Act is therefore a substantial improvement over the efforts by some states to protect people from regulatory takings, because most states have not done much to reduce the difficult process of filing claims. Florida's Harris Act, for example, includes what that state's courts have called "complex presuit requirements." & the Harris Act authorizes compensation only for as-applied challenges to governmental action, meaning that property owners cannot recover for reductions in property rights that result from across-the-board regulations that diminish the property values of all owners equally.

16. **The Private Property Rights Act: Forcing Federal Regulators to Obey the Bill of Rights**: It is time for federal regulators to obey **the Bill of Rights**. This is the message of the Private Property Rights Act (S. 50), introduced in the Senate by Steve Symms, the Idaho Republican. Symms's bill would give teeth to the Fifth Amendment's requirement that no "private property be taken for public use, without just compensation." Targeted by the bill is the mounting practice of government regulations to deprive individuals & businesses of the use of their property without compensating the owners for the loss of their property. Ile Symms bill would codify & make permanent Executive Order 1260, signed by Ronald Reagan in 1988, which requires federal agencies to consider whether their actions might infringe on property rights and, if they do, to seek alternative ways to achieve their goals. The Symms bill also would give the President a legislative weapon to use in his fight to make all federal agencies fully & consistently put the right of property ahead of the power of bureaucrats. Just Compensation. The Fifth Amendment's requirement that when the government takes private property the government must compensate the owner is referred to interchangeably as the "Just Compensation Clause," the "Eminent Domain Clause," or the "Takings Clause." Thus, if the government needs land on which to build a road, it must pay the owner for the land. The Fifth Amendment also applies to other infringements of property rights that fall short of total confiscation; on these, however, the courts have upheld the right to compensation only inconsistently. In recent years property owners have found the use & enjoyment of their property more & more restricted by regulators, often in the name of environmental protection. Thus, for example, individuals have bought land

for houses only to be told that they are no longer allowed to build. Farmers have bought land for farming only to be told that they are not allowed to farm because their land must be left in its natural state. Businesses have been told to shut down mining operations not, as it turns out, to prevent them from polluting, but because their mining property has been designated as a "wetland" that must be preserved. Typically, in such cases, the government has not voluntarily compensated the owners for their losses. Shift in Court. Since 1987, however, the Supreme Court has started to recognize that regulation is often used as a substitute for the power of eminent domain: Instead of buying land outright, the government often tries to avoid the requirement of paying compensation by simply commanding property owners to use their land in whatever manner the government wishes. In the face of this practice, however, the Supreme Court has begun to hold that regulation, as much as outright confiscation, can be subject to the constitutional requirement of just compensation. In response to this shift in the Supreme Court's treatment of regulatory takings, Ronald Reagan in 1988 issued Executive Order 12630, which requires federal agencies to determine in advance if their actions may prompt a claim for compensation. The purpose of the Order is twofold: to protect private property owners from the inadvertent, de facto confiscation of their property through regulation, & to control & limit the amount that taxpayers have to pay in just compensation awards to people whose property has been taken by federal regulation. Such awards will soon become a major budget item. The total amount of such outstanding claims is over one billion dollars & growing rapidly. The Executive Order has been applied diligently by some government

agencies but has been resisted by others. A future President, moreover, could rescind the order. Symms's bill would make permanent the protection offered by the Executive Order & require that the Attorney General certify that each agency is in compliance with the Order's principles. The Symms legislation could be improved if it required that compensation be paid out of the budget of the agency at fault in taking private property without compensation. This would give agencies a strong incentive to avoid unnecessary takings of the property rights of the citizens.

17. **THE FIFTH AMENDMENT**: The federal government & the states have the power to condemn & take over land for such public uses as roads, parks, post offices, or military bases. The Fifth Amendment to the U.S. Constitution stipulates that in such cases, which are **called "takings," the owner must be compensated for the loss of the property.** As the Supreme Court has explained, "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness & justice, should be borne by the public as a whole. "I Since the general public thus benefits, the Court has declared, "the public at large, rather than a single, must bear the burden of an exercise of state power in the public interest. Armstrong v. United States, 364 U.S. 40, 49 (1960). Agins v. City of Tiburon, 447 U.S. 255, 2 60-61 (1980). Although the Just Compensation Clause in the Fifth Amendment is mainly concerned with land, it applies to any kind of property. Example: If in a military emergency the government were to confiscate airplanes or ships from private owners, or simply require that they be turned over to the

government for the duration of the emergency, the government would have to compensate the owners. Government can take an interest in property short of complete ownership, moreover, & still be required to pay compensation for what it has taken. Thus, for example, where flights of government aircraft over private property are so low & frequent as to constitute a direct & immediate interference with the use & enjoyment of the land, the government has taken a flight easement for which it must pay damages to the landowner.

18. **REGULATORY TAKINGS**: The government also takes property rights by imposing restrictions on the use of property. Suppose, for example, the government wants to preserve a forest or a wetland in its natural condition, either for recreational use or for a wildlife refuge. If the government were to condemn the land outright, there would be no question about its obligation to compensate the landowner. Yet, suppose further that the government decides to leave legal title to the land with its private owner & passes a regulation prohibiting the owner from developing the land, or from farming it, or from doing anything else that changes the land's natural state. In this case the government would be compelling the private landowner to devote the land to whatever use the government desires. In effect, the government here takes away from the owner the right to use the land. The private owner of the land would be owner in name only; the effective owner would be the, government, although in almost all instances the private owner would still be liable for the payment of property taxes on the land. This would be an attempt to circumvent the Fifth Amendment & to achieve the same ends as would out- right condemnation, but without paying compensation. Common

Law Rights. Not all regulations, of course, infringe on private property rights. Under the common law of property & tort, a landowner's property rights are defined & limited by the property rights of his neighbors. If a regulation merely prevents someone from engaging in activities that would violate the rights of others under the common law of nuisance or trespass, 4 such as polluting a river that runs through a neighbor's land, then the landowner has no right to compensation, even though the value of the landowner's land may be diminished as a result of the prohibition. This is because the landowner has no right to engage 3 United States v. Causby, 328 U.S. 256, 267 (1946). common law kept clear the important distinction between inflicting a harm & withdrawing or denying a benefit. In general, only physical invasions counted as injuries & could give rise to a cause of action. See Richard A. Epstein, Takings: Private Property & the Power of Eminent Domain (Cambridge. Mass.: Harvard University Press, 1985), pp. 107-125. in such activities to begin with. Regulations in such cases actually would protect private property rights. The Easement Option. By contrast, if a particular activity would not violate the property rights of others as defined under the common law of trespass or nuisance & would not give others any legal ground to sue, then a landowner has the right to engage in the activity on his or her own land. If a neighbor wants to prevent the landowner from engaging in some activity that does not violate the neighbor's property rights, the neighbor must pay the landowner to abstain from the activity; & if the neighbor wants to stop the activity permanently, he or she must purchase an easement from the landowner. This means that any regulation that prevents people from engaging in activities on their land that do not violate the property rights

of others abridges the property rights of the landowners whose activities are restricted. Specifically, such a regulation takes away some of the landowners' rights in the use & enjoyment of their land, in effect taking an easement that should have been theirs to sell. Even if many other desirable uses are still permitted to the landowners, the regulation is a partial taking. As such, the landowners deserve to be compensated for whatever property rights they have lost. **COMPUTING COMPENSATION**: Whenever a regulation takes away private property rights, the proper measure of compensation is the difference between the value of the property with & without the regulation; this difference is the value of the easement the government has taken. Of course, if the property is worth just as much with the regulation as it is without it, then no loss in value has been caused, & no compensation is owed. Similarly, some government actions may reduce the value of land without taking away property rights, & hence do not give rise to an obligation to compensate. Example: A decision to close an exit along a particular highway, or to build a new highway someplace else, may diminish the value of hotels & restaurants along the original highway. If the landowners' property rights in the use of their land have been left fully intact, however, then they are not entitled to compensation out of taxpayer funds. The mere fact that a regulation amounts to a taking does not mean that the government cannot go forward with the planned regulation. It simply means that the government must pay compensation in order to do so. The only issue properly involved in regulatory takings cases under the Fifth Amendment is the right to compensation, not the validity of the regulations. 5 See, eg., Office of Legal Policy, U.S. Department of Justice, *Economic Liberties Protected by*

the Constitution, March 16, 1988, pp. 7-11, 32.6 An easement is a right over the property of another. An affirmative easement is a right of use, such as a right of way allowing one to pass over the land of another to access a road or a beach, or a right to discharge water onto neighboring land. A negative easement is a restriction on the use of land by its owner, prohibiting him from doing something which would otherwise be lawful. A negative easement may also be called a "restrictive covenant" or a "negative servitude." Black's Law Dictionary, Fifth Edition (St. Paul, Minn.-West Publishing Company, 1979). pp. 457-58, 1182, 1229.

19. **PROBLEMS IN THE CASE LAW**: Although the Supreme Court has recognized for at least 70 years that regulations can constitute a taking of private property for public use, it has awarded compensation only rarely. Often the Court found procedural or technical reasons to avoid ruling on regulatory taking claims. In many cases, the Court has denied compensation on the ground that the regulation is an exercise of the "police power" of the federal government or of the state governments, even though the Fifth Amendment contains no "police powers exception. Police power originally referred only to government action that sought to guard against genuine threats to health, safety, or property. Examples of this might include zoning laws that ban toxic waste dumps or nuclear reactors from residential areas. Over the years, however, the term "police power" has been expanded to cover virtually any government action. As a result, any action that is for a public use or purpose usually constitutes an exercise of the police power in the eyes of the court. In cases in which the plaintiff seeks to invalidate a regulation, the "police power" doctrine can be appropriate. But it is not appropriate in cases where the plaintiff is

merely seeking compensation. The fact that a regulation that takes private property rights may fall within the police power, as that power has come to be defined by the courts, only suffices to show that the regulation is consistent with the Fifth Amendment's requirement that takings be for public use; it cannot eliminate the requirement that just compensation be paid. Before it clarified matters in 1987, the Supreme Court often acted as though the issue before it was whether a regulation was valid, when in fact the proper constitutional issue was whether a constitutionally valid regulation nonetheless required payment of just compensation. Confusing the issue, the Supreme Court also has held sometimes that a regulation is not a taking of property unless the regulation leaves the property owner with no remaining "economically viable use'" of his property. This has meant Pennsylvania Coal Co. v. Mahon.  260 U.S. 393 (1922). The Court considered but rejected a regulatory claim some 35 years earlier in Mugler Y. Kansas, 123 U.S. 623 (1887). For examples of regulations do have been upheld on "police power" grounds, see Office of Legal Policy, op. cit., p. 35; Epstein, op. cit., pp. 112- 15, 121- 25, 130- 34, 140- 41.9 For example, in Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926), the first case to uphold zoning. a constitutional challenge, the plaintiff did not even seek just compensation under the Fifth amendment in his appeal before the Supreme Court (although he had sought just compensation in the courts below), but instead merely sought an injunction against enforcement of the zoning ordinance on the ground that it took his property without due process of law, in violation of the Fourteenth Amendment. 10 See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 491 n. 20 (1987). 11

E.g., Agins v. City of Tiburon, 447 U.S. 255, 260 (1980); United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985). Other cases have explicitly or implicitly rejected this view. E.g., Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922); Loretto v. Teleprompter Manhattan CAW Corp., 458 U.S. 419 (1982).7 1be Court has never specified just how remunerative a remaining use must be in order to count as "economically viable." That a regulation must render the affected property essentially worthless before the Supreme Court will recognize a taking & award compensation. In these cases, the Court seems to have confused the issue of whether a taking has occurred with the issue of how much should be paid as compensation. Obviously, if a regulation leaves a property owner with some remaining "economically viable use" of his property, then the owner is not entitled to receive the full pre-regulation value of his property as compensation. The owner is entitled, however, to compensation for the drop in value resulting from the regulation, regardless of whether the property's remaining value is great or small, so long as it is less than the pre-regulation value. There is a middle ground between paying the full value of the affected property as compensation & paying nothing. This middle ground consists of paying the value not of the property in its entirety, but of the easement that defacto has been taken.

20. **REVERSING THE TREND**: In 1987 the Supreme Court's treatment of the Fifth Amendment's Just Compensation Clause began to change significantly. First, the Court made clear that the "police power" doctrine, which it often had used to uphold the validity of statutes, does not apply to takings claims brought under the Fifth Amendment, & hence does not constitute

an exception to the Just Compensation Clause. The Court also explicitly rejected the notion that the only remedy for a regulatory taking is invalidation of the regulation, making clear that compensation is an appropriate remedy even for a partial or temporary taking. The Court further explicitly recognized that easements are a form of partial taking of property that can arise in the context of regulation or a permit-application process. Finally, the Court explicitly rejected the notion that "economically viable use" of a landowner's remaining property rights will always necessarily bar an award of just compensation for an easement that was taken. See Keystone Bituminous Coal Assn v. DeBenedictis, 480 U.S. 470, 491 n. 20 (1987). When the government formally seeks to condemn a piece of land, compelling the owner to sell, it institutes an eminent domain proceeding. When a landowner whose land has been invaded or restricted by government, but who has retained legal title in his land due to the government's failure to invoke the power of eminent domain, wishes to obtain compensation by compelling the government to buy the land (or at least an easement therein), he institutes an inverse condemnation proceeding. First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 48 2 U.S. 304 (1987). First English dealt with a temporary taking, but the underlying principle is equally applicable to permanent takings of partial interests in property. Nollan v. California Coastal Comm'n, 483 U.S. 825 (1987). In Nollan, the Court found a taking where the California Coastal Commission refused to grant a building permit to owners of beachfront property unless they agreed to convey to the government an easement for public access to the beach over their land. Nollan, 483 U.S. at 830, 834-37. See also Loretto v. Teleprompter

Manhattan CAW Corp., 458 U.S. 419 (1982). Both of these cases involved regulatory actions requiring landowners to submit to physical invasions of their land or buildings by others. However, the principle of providing partial compensation for a partial taking should apply regardless of the nature of the easement taken. These rulings all made it easier for landowners whose property rights are taken by regulation to obtain just compensation, prompting an attorney with the Congressional Research Service to proclaim the emergence of "a court trend supporting increased protection of private property against government controls." This trend appears likely to continue. The Supreme Court late last year agreed to hear two cases that will give an opportunity to strengthen Fifth Amendment protections of private property. The more widely publicized of the two involves a South Carolina law that prohibits new building on ocean front property. In this case, a man had bought two beachfront lots in 1986 for a total of $975,000, planning to build a house for his family on one lot & to build a house to sell on the other lot. Two years later, South Carolina passed a law prohibiting new building near the beach. This law has prevented the man from building a house on his land even though such a house would pose no threat to his neighbors & would be no closer to the beach than many other nearby lots in the same development, including those on either side of his, that were built before the 1988 law was passed. As a result of the law, the two lots have been rendered virtually worthless. The fact that the Supreme Court has accepted the two cases leads many observers to predict that the Court will reinvigorate the constitutional right to just compensation. M Substantial Awards. The trend toward granting compensation for regulatory takings also has been

reflected in the United States Claims Court, the special federal court in Washington, D.C., that hears all just compensation claims against the federal government. In 1990, for example, for the first time ever, the Claims Court held that two landowners who had been denied permits under the federal Clean Water Act to use their land in various ways because the government had classified the land as a "wetland" were entitled to just compensation because the government failed to prove that the substances that would have been discharged into the wetlands would have lowered water quality. Claims Court awarded the respective Indowners over $1 million dollars in one case LZ & over $ 2.6 million in another, specifically basing its decisions on the distinction between 137 Cong. Rec. S 684 (daily edition, January 14, 1991) (statement of Senator Symms) (the identities of the CRS attorney & the publication quoted are not provided). The Court heard oral arguments in both cases earlier this year. Lucas v. South Carolina Coastal Council, 112 S. CL 436 (cert. granted Nov. 18, 1991) (No. 91- 453). The other Fifth Amendment just compensation case that the Court has agreed to hear involves a challenge by the owner of a mobile-home park in Escondido, California to a local rent control ordinance. Yee v. City of Escondido, 112 S. CL 294 (cert. granted October 15, 1991) (No. 90-1947). In the vast majority of cases under the Clean Water Act, the decision to deny a landowner a permit to fill in a wetland has nothing to do with any polluting properties of the substance that would be used to fill the wetland; often this substance consists simply of dirt taken from one pan of the wetland & deposited onto another. See William G. Laffer 111, "Protecting Ecologically Valuable Wetlands without Destroying Property Rights," Heritage Foundation

Backgrounder No. 840, July 15, 1991.  22 Florida Rock Industries v. United States, 21 Cl. Ct.  161 (1990) (involving the mining of limestone). This case is now on appeal before the U.S. Court of Appeals for the Federal Circuit. Love ladies Harbor, Inc. v. United States, 2 1 Cl. Ct. 153 (1990) (involving the building of houses). Mis case is tortious & nontortious uses of land. In each case, it was clear that the decision by the Army Corps of Engineers to deny a permit under the Clean Water Act had nothing to do with the prevention of water pollution, but instead was motivated purely by a desire to preserve the wetlands in question as wetlands. Therefore, the Corps of Engineers was really confiscating an easement on the landowners' land, taking away some or all of their development rights. While these two cases are on appeal, there is evidence that higher courts will side with property owners. In a bellwether case, the Claims Court in 1989 awarded over $150 million to a company that had been prohibited by the Department of the Interior from mining coal on its own land. The Court of Appeals last year affirmed the decision, & the Supreme Court declined to take the government's appeal, thereby allowing the lower court decisions to stand. The Supreme Court's decision not to review the lower courts' rulings in this case is widely viewed as solid evidence that it will decide the cases currently before it in favor of justly compensating the landowners.

21. **PAYING FOR REGULATORY TAKINGS**: The increased ability of property owners to secure just compensation when their property rights are taken by regulations means that the government, & hence the taxpayers, can expect to pay more in coming years for actions that restrict property rights. As a consequence of the court rulings of the past five years, & of

the explosive growth in regulation over the past twenty years, the number of takings claims filed against the government, the frequency with which property owners seeking just compensation win, & the average dollar amount awarded to successful claimants all have increased. Consider the following: Over 52 cases alleging the taking of property & seeking compensation were filed with the Claims Court last year, the most in at least a decade, & possibly the most ever. Nearly 200 takings cases are pending in the Claims Court. [The total compensation that the U.S. would have to pay if those seeking now on appeal before the U.S. Court of Appeals for the Federal Circuit.] See Florida Rock Industries, 21 Cl. CL at 16 6-68. The only damage that is done when a wetland is filled with chemically harmless material is to the landowner's own property, the wetland; there is no physical invasion of anyone else's land or water such as would give rise to a common-law nuisance action. See Epstein, op. cit., p. 123. 25 Whitney Benefits, Inc. v. United States, 18 Cl. Ct.  394 (1989), modified, 20 Cl. Ct. 324 (1990), afd, 926 F. 2d 1169 (Fed. Cir.), cert. denied, 112 S. Ct. 406 (1991). eg., Moore, "Showdown on Property Rights," National Journal, November 30, 1991. p. 2940; "Environment Laws Face a Stiff Test from Landowners," The New York Times, January 20, 1992, p. A1. 27 Ibid. 28 Ibid. redress were to win & receive the full amount that they are seeking is well over $1 billion. Although the United States surely will win & thereby avoid paying compensation in many of these cases, the frequency with which property owners seeking just compensation win has risen sharply in recent years. Property owners won more than half of all regulatory taking cases decided by the federal courts in 1990, the most recent year for which figures are available. In contrast, the federal government wins nine

out of ten times in other areas of the law. The growth in federal regulation in the past three years, & the trend in the courts toward protecting private property owners, means that the government can expect to pay more in the future to compensate for regulatory takings.

22. **EXECUTIVE ORDER 12630**: On March 15, 1988, in response to the Supreme Court's 1987 takings decisions & the perceived increase in the likelihood of the federal government having to pay increased just compensation awards, Ronald Reagan issued an Executive Order dealing with Government Actions & Interference With Constitutionally '29 Protected Property Rights.' This detailed Executive Order basically requires each department or agency in the Executive Branch: to consider in advance whether any contemplated action might, under the Supreme Court's case law as it stands at the time of the agency's or department's determination, be a taking of private property, & hence lead to an eventual judgment against the U.S. that must be paid by the Treasury; to estimate the potential cost to the federal government of any contemplated action regulating the use of private property, in the event that a court later determines that the action constituted a taking; to look for alternatives that would achieve the same ends but would not involve takings or would impose less on private property; X to decide in advance whether a particular action that may result in a taking is worth what it is likely to cost; & X to set regulatory priorities. The Executive Order also gives the departments & agencies detailed & specific instructions on how to minimize the burdens imposed on private property & the resulting liabilities imposed on the Treasury. These instructions include: X avoiding undue delays in granting or denying permits, & in making other decisions

affecting private property; 29 Exec. Order No. 12630. 53 Fed. Reg. 88 59 (Mh 18, 1988). Design that permits are granted or denied based on the same standard; ensuring that restrictions imposed on the use of private property are not disproportionate to the contribution of the restricted uses to the overall problem that the restrictions are imposed to redress. The purpose of all these measures is to avoid taking private property inadvertently, & thereby to avoid incurring unanticipated costs to the taxpayers. Executive Order 12630 does not add to or alter the Fifth Amendment's requirement that just compensation be paid, the probability that those landowners whose property is taken will be paid, or the amount that they will recover if they are paid. It simply requires Executive Branch agencies & departments to anticipate the potential fiscal consequences of their actions. Given the recent changes in the Supreme Court's standards for awarding just compensation, if federal officials fail to conduct such an inquiry before acting, they run a significant risk that the federal government will get stuck with an unexpected bill several years later. This also would mean that the government could end up being compelled to pay for properties that it would not have chosen to buy if it had thought about its priorities in advance. Thus, the Executive Order is really just a **"look before you leap" provision designed primarily to protect the taxpayers**. It mainly is a budgetary tool, a device for controlling spending, paying Costs of Regulation. Yet, the **Executive Order also protects property owners.** Since regulators will be forced to refrain from taking actions that they cannot afford to pay for, many regulatory takings of private property will be deterred. Regulators no longer will be able to treat private property as a

free good, usable without limit & without cost. Instead, they will have to decide how much regulation they can afford. Thus, even though the Executive Order does not affect the ability of those whose property is taken to obtain compensation, it will still protect landowners. [After all, landowners who have their property taken without their consent & who receive court-determined compensation?] I most always would prefer to forego the compensation & keep their land. There are two reasons why this is so. First, if the compensation provided were worth as much in the eyes of the land- owner as the property taken, the landowner would sell voluntarily, & the government would gain nothing by taking rather than buying. Second, compensation is risky & uncertain, & difficult & expensive to seek & obtain. Therefore, requirement has been violated often in the past. The Army Corps of Engineers, for example, routinely abuses its enforcement authority under the Clean Water Act, which is purely an anti-pollution statute, by granting permits for discharges of materials that pose no threat to water quality only on the condition that the landowner set aside land for wildlife protection at his own expense. Presumably even then they would still be entitled to receive compensation for any temporary taking that had occurred. However, under the Uniform Relocation Assistance & Real Property Acquisition Policies Act of 1970. 42 although court-determined compensation is better than nothing, landowners generally would be better off if their land had not been taken in the first place.

23. **BEYOND THE EXECUTIVE ORDER: THE NEED FOR A STATUTE:** Although the Executive Order is a major step toward protecting private property rights, it lacks the force of law. Officers & employees of the Executive Branch

have no statutory obligation to comply with the order. The president, moreover, may rescind the order at any time. Explains Senator Malcolm Wallop, the Wyoming Republican: But the order is not without shortcomings. It has no teeth. Without the possibility of judicial review or the requirement of disclosure, the executive branch can ignore the order with impunity. Moreover, as with all executive orders, it can be withdrawn on a whim. To date, some parts of the Executive Branch have been more diligent & enthusiastic in complying with the Executive Order than others. Regulators in the EPA, for example, have resist V. the Executive Order because they view it as a threat to their ability to regulate. In practice, the easiest way to circumvent the Executive Order is routinely to find "no takings implications" when performing the "Takings Implication Assessment" required by the Attorney General's guidelines for implementing the Executive Order. Existing Supreme Court & lower court pre- cedents are sufficiently open-ended to allow such a conclusion to be reached in many instances without an obvious breach of good faith. The Executive Order, meanwhile, does not limit the government's ability to regulate. The Takings Clause & the Executive Order allow regulation, but merely require that it be budgeted before the fact, in the case of the Executive Order, & paid for after the fact, in the case of Takings Clause. To strengthen the Executive Order & give it the force of law, Senator Symms introduced his Private Property Rights Act, S. 50. The Bush Administration strongly supports S. 50, & the Senate approved the bill last year. The House of Representatives, however, has not yet even considered the measure. The proposed legislation states that: No regulation promulgated after the date of enactment of this Act by any agency shall become effective until the

issuing agency is U.S.C. 4654(c), those who succeed in obtaining an award of compensation for the taking of property by a federal agency also receive, as part of their award, reimbursement for any "reasonable costs, disbursements, & expenses, including reasonable attorney, appraisal, & engineering fees," that they are forced to incur in order to obtain their compensation from the government.  136 Cong. Rec. S 10917 (daily edition, July 27, 1990) (statement of Senator Wallop). Specifically, the EPA opposed adoption of the Executive Order, attempted to soften its requirements as much as possible, attempted to soften the guidelines for implementing the Executive Order, & actively lobbied against legislation aimed at reinforcing the Executive Order until the Administration had officially endorsed the legislation. Certified by the Attorney General to be in compliance with Executive Order 12630 or similar procedures to assess the potential for the taking of private property in the course of Federal regulatory activity, with the goal of minimizing such taking where possible. This language would prevent any new regulation from taking effect unless the agency issuing the regulation: 1) has adopted procedures for assessing the potential impact of its regulatory activity on private property, as required by the Executive Order; & 2) has had its compliance with the applicable procedures certified by the Attorney General. Not only would the Symms bill force the bureaucracies to take the Executive Order more seriously by putting conditions on their ability to regulate, but it would make permanent the protection afforded to private property by the Executive Order. Executive departments & agencies would not be able to regulate until the Attorney General had certified their compliance with the applicable procedures for assessing the impact of regulatory

activity on private property. & the Attorney General cannot certify such compliance if such procedures do not exist. Therefore, no subsequent President could rescind the Executive Order without replacing it with something equivalent. By making the bureaucrats' ability to regulate conditional upon their compliance with the Executive Order, or with any similar procedures that might be adopted in the future, the legislation proposed by Senator Symms would give regulators an incentive to respect private property rights. **HOLDING AGENCIES ACCOUNTABLE**: The Symms bill, however, goes only part way in defending the Fifth Amendment. To prompt regulators to take the greatest care when regulating property, for example, a bill could require all just compensation awards to come out of the budget of the agency or department that had imposed the regulations. Currently all such judgments come out of a "Judgment Fund" appropriated separately from any individual agency's or department's budget. The Executive Order requires the Office of Management & Budget to "take action to ensure that all takings awards levied against agencies are properly accounted for in agency budget submissions." But this requirement is not binding on Congress & may be repealed by the President at any time. Last year the Bush Administration proposed legislation that would require agencies & departments to reimburse the Judgment Fund out of their individual budgets, but nor Representative or Senator has yet introduced the Administration's bill. 35 S. 50, 10 2nd Cong., 1st Sess. 3 (1991).

### THIRD CAUSE OF ACTION

**Municipal and Supervisory Liability (42. U.S.C. § 1983)**

**(By Plaintiff Against San Bernardino County Land Use Services Department)**

24. Plaintiff hereby re-alleges and incorporates by this reference, as though set forth in full, the allegations in paragraph 1 through 23, inclusive.

25. On and for some time prior to 2021(and continuing to the present date) Defendants San Bernardino County Land Use Services Department deprived Plaintiff Lynn Macy of the rights and liberties secured to them by the 4th and 14th Amendments to the United States Constitution, in that said Defendants and their supervising and managerial employees, agents, and representatives acting with gross negligence and with reckless and deliberate indifference to the safety, rights, and liberties of the public in general and of Plaintiff Lynn Macy, and of persons in their class, situation and comparable position, in particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

    (a) Employing and retaining as county officials and other personnel, including San Bernardino County Land Use Services Department at all times material herein knew or reasonably should have known had propensities for abusing their authority and for mistreating citizens by failing to follow their County Policies;

    (b) Inadequately supervising, training, controlling, assigning and disciplining San Bernardino County Land Use Services Department and other personnel, each knew or in the exercise of reasonable care should have known the aforementioned propensities and character traits;

    (c) Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, controlling and disciplining the intentional conduct by San Bernardino County Land Use Services Department and other personnel.

(d) Failing to adequately train Defendants San Bernardino County Land Use Services Department and failing to institute appropriate policies regarding constitutional procedures and practices;

(e) Having and maintaining an unconstitutional policy, customs, procedures of using excessive trespassing which is also demonstrated by inadequate training regarding these subjects.

26. Defendants San Bernardino County Land Use Services Department had either actual or constructive knowledge of the deficient policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above these Defendants condone, tolerated, and through actions and inactions thereby ratified such policies. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff Lynn Macy and other individuals similarly situated.

27. By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and wrongful acts, Defendants San Bernardino County Land Use Services Department acted with intentional, reckless, and callous disregard for the safety and constitutional rights of Plaintiff Lynn Macy. Defendants San Bernardino County Land Use Services Department actions were willful, wanton, oppressive, malicious, fraudulent, extremely offensive, and unconscionable to any reasonable person of normal sensibilities.

28. By reason of the aforementioned policies and practices of Defendants San Bernardino County Land Use Services Department acted with

intentional, reckless and callous disregard for the safety and constitutional rights of Plaintiff Lynn Macy. Defendants San Bernardino County Land Use Services Department caused Plaintiff Lynn Macy incurred damages in the form of psychological and emotional injuries, including, without limitation, pain and suffering, sleep deprivation, humiliation, all of which are continuing and damaging to reputation. Plaintiff's actual damages will be ascertained at trial.

29. The policies, practices, and customs implemented and maintained and still tolerated by Defendants San Bernardino County Land Use Services Department acted with intentional, reckless and callous disregard for the safety and constitutional rights of Lynn Macy. Defendants San Bernardino County Land Use Services Department were affirmatively linked to and were significantly influential forces of Plaintiff Lynn Macy.

### FOURTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress**

**(By Plaintiff Against San Bernardino County Land Use Services Department)**

30. Plaintiff hereby re-alleges and incorporates by this reference, as though set forth in full, the allegations in paragraph 1 through 29, inclusive.

31. Plaintiff are informed and believe and thereon alleges that Defendants' actions described in this Complaint were intentional, extreme, and outrageous. Defendants are restricting the Use of Land of Plaintiff, which caused Plaintiff a great deal of emotional distress.

32. Plaintiff are further informed and believe and hereon alleges that such actions were done with intent to cause serious emotional distress and were done with reckless disregard of the probability of causing Plaintiff serious emotional distress.

33. As a proximate result of the Defendants actions Plaintiff Lynn Macy incurred damages in the form of psychological and emotional injuries, including, without limitation, pain and suffering, sleep deprivation, humiliation, all of which are continuing and damaging to reputation. Plaintiff's actual damages will be ascertained at trial.

34. The conduct of the Defendants was despicable, malicious, wanton, oppressive and accomplished with a conscious disregard for Plaintiff Lynn Macy's rights, entitling Plaintiff Lynn Macy to an award of exemplary and punitive damages. Defendants only goal against Plaintiff were for monetary gain.

**WHEREFORE,** Plaintiff's pray judgment against Defendants as follows:

1. For compensatory damages in an amount to be proven at trial:

2. For treble damages pursuant to the Bane Act;

3. For punitive damages on those claims where it is available pursuant to law in an amount sufficient to punish, deter and make an example of the Defendants;

4. For interest on those claims where it is available under law;

5. For cost of suit; and

6. For such other and further relief as this Court may deem to be just and proper.